# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KETAN JHAVERI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0410-LWW |
| | ) | |
| K1 INVESTMENT MANAGEMENT | ) | |
| LLC, EDISON PARTNERS | ) | |
| MANAGEMENT LLC, RAJ GOYLE, | ) | |
| CHRISTOPHER SUGDEN, DAN | ) | |
| HERSCOVICI, MIKE VELCICH, ERIC | ) | |
| ELFMAN, ERIC SMITH, EDISON IX | ) | |
| GP, LLC, EDISON PARTNERS IX, LP, | ) | |
| K4 CAPITAL ADVISORS, L.P., K4 | ) | |
| PRIVATE INVESTORS, L.P., ONIT | ) | |
| HOLDINGS, INC., and ONIT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 28, 2025
Date Decided: June 27, 2025

Ketan Jhaveri, *pro se*

Robert L. Burns & Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Martin Roth & Nadia Abramson, KIRKLAND & ELLIS LLP, Chicago, Illinois; *Counsel for Defendants K1 Investment Management, LLC, Mike Velcich, Eric Elfman, Eric Smith, K4 Capital Advisors, L.P., K4 Private Investors, L.P., Onit Holdings, Inc., and Onit, Inc.*

Robert L. Burns & Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Kathleen Goodhart, COOLEY LLP, San Francisco, California; Amanda Liverzani, COOLEY LLP, New York, New York; *Defendants*

*Edison Partners Management LLC, Edison IX GP, LLC, Edison Partners IX, LP, Christopher Sugden, and Dan Herscovici*

Robert L. Burns & Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rishi Bhandari & Robert Glunt, MANDEL BHANDARI LLP, New York, New York; *Counsel for Defendant Raj Goyle*

**WILL, Vice Chancellor**

This case, filed by a co-founder of Bodhala, Inc., involves a multitude of claims stemming from Bodhala's 2021 sale to Onit, Inc. The plaintiff, a significant Bodhala stockholder at the time of the acquisition, was compensated with millions of dollars in merger consideration. In exchange, he agreed to comprehensive releases of Bodhala, Onit, and their related parties from all pre-closing claims.

Seven of the plaintiff's claims—for breach of fiduciary duty, aiding and abetting, and fraud—are barred by the unambiguous releases he executed. His claim for breach of the implied covenant of good faith and fair dealing fails on the merits. But his breach of contract claim is partly viable, and a related claim for tortious interference with contract may proceed against all but one of the named defendants.

## I.      FACTUAL BACKGROUND

The following facts are drawn from the operative complaint, documents it incorporates by reference, and matters subject to judicial notice.[1]

### A.      Bodhala's Founding and Funding

Plaintiff Ketan Jhaveri and defendant Raj Goyle met in 1997 at Harvard Law School.[2] Thirteen years later, while Jhaveri was practicing at a prominent law firm,

---

[1] Pl. Ketan Jhaveri's Compl. Against K1, Edison, and Raj Goyle (Dkt. 1) ("Compl."); *see In re Books A Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. 2016) (explaining that judicial notice may be taken of facts "not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[2] Compl. ¶ 3.

they reunited and founded Bodhala, Inc. as equal partners.[3] With third co-founder Brad Chick, Jhaveri and Goyle built Bodhala into a successful software-as-a-service (SAAS) company used by top financial institutions to monitor legal spending.[4] Jhaveri and Goyle served as directors and officers of Bodhala, with Jhaveri its President and Goyle its Chief Executive Officer.[5] Chick served as Chief Technology Officer.[6]

Bodhala closed its Series A financing round in March 2020.[7] Defendant Edison Partners IX, LP ("Edison Partners IX")—a fund managed by defendant Edison IX GP, LLC ("Edison IX GP")—invested.[8] As a result of that financing, Bodhala's Board was expanded to five members in December 2020.[9] Defendant Daniel Herscovici—an Edison Partners Management LLC ("Edison Partners")

---

[3] *Id.* ¶¶ 1, 3.  Bodhala was formed as a Delaware corporation.  *Id.* ¶ 26.  Jhaveri and Goyle each originally granted themselves a 45% stake, with the remaining 10% allocated to a third co-founder, Brad Chick.  *Id.* ¶ 4.  After increasing Chick's stake to 20%, Jhaveri and Goyle held 40% each.  *Id.*

[4] *Id.* ¶¶ 4-5.

[5] *Id.* ¶¶ 74, 81.

[6] *Id.* ¶ 76.

[7] *Id.* ¶ 93.

[8] *Id.* ¶¶ 37, 93; *see also id.* ¶ 33 (explaining that Edison IX GP is the general partner of Edison Partners IX); Defs. Edison P'rs Mgmt. LLC, Edison IX GP, LLC, Edison P'rs IX, LP, Christopher Sugden, and Daniel Herscovici's Mot. to Dismiss, with a Certificate of Serv. (Dkt. 25) ("Edison Opening Br.") 1 (clarifying the relationships between the different Edison defendants).

[9] Compl. ¶¶ 94-96.

partner—was appointed to the Board.[10]  Edison also appointed another director, as did Goyle and Jhaveri.[11]

### B.    The Onit Merger

In 2019, defendant Onit, Inc. showed interest in purchasing Bodhala.[12]  Onit is a Houston-based technology company specializing in business process automation.[13]  It is controlled by defendant K1 Investment Management, LLC.[14]  Onit's discussions with Bodhala stalled because Jhaveri believed a sale was premature.[15]

In May 2021, Goyle told the Board that he had retained JEGI Clarity—an M&A advisory firm—to assist with a potential sale of Bodhala.[16]  The retention letter suggested that talks with Onit had been renewed, of which Jhaveri had been unaware.[17]

---

[10] *Id.* ¶ 87.

[11] *Id.* ¶¶ 93-96.

[12] *Id.* ¶¶ 70-73.

[13] *Id.* ¶ 27; *see also* Onit, Inc., Home Page, https://www.onit.com (last visited Mar. 28, 2025).

[14] Compl. ¶ 27.

[15] *Id.* ¶ 73.

[16] *Id.* ¶¶ 238-40.

[17] *Id.* ¶ 240.

In late May and early June, Onit submitted term sheets outlining the details of its offer to purchase Bodhala.[18] JEGI also made multiple presentations to the Board about Onit's offer, including on June 11, July 21, and August 8.[19] Jhaveri attended these presentations, asked questions, and repeatedly said that Onit's offer was too low.[20] Negotiations over a definitive merger agreement ensued, with the parties exchanging over thirty drafts.[21] Jhaveri received two draft merger agreements before discussions at Board meetings.[22]

## C. The Merger Agreement

On August 15, Jhaveri and other stockholders received the final Merger Agreement, an Information Statement, and a Joinder Agreement.[23] The Merger Agreement was executed on August 17.[24] Goyle signed the Merger Agreement on behalf of Bodhala as the "Equityholders' Representative."[25] The same day, Jhaveri

---

[18] *Id.* ¶ 256.

[19] *Id.* ¶¶ 264, 280, 284.

[20] *Id.* ¶¶ 265-70, 279, 281.

[21] *Id.* ¶ 278.

[22] *Id.*

[23] *Id.* ¶ 308.

[24] *Id.* ¶ 43.

[25] *See* Trans. Aff. of Nicholas F. Mastria, Esq. in Supp. of Opening Br. in Supp. of Def. Raj Goyle's Mot. to Dismiss (Dkt. 24) ("Mastria Aff.") Ex. A ("Merger Agreement") 80 (signature page). The Merger Agreement is integral to and expressly referred to in the Complaint, such that it is incorporated by reference. *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a [petitioner] expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be

4

signed the Joinder Agreement in his individual stockholder capacity, evincing his "willingness to enter into" and "become a party to the Merger Agreement."[26]

The Merger Agreement included a broad release by each "Equityholder" of any claims that may have arisen before closing against Onit, Bodhala, and their stockholders, directors, officers, employees, and agents.[27] The Equityholders agreed that their receipt of merger consideration would "constitute [their] express acceptance of the terms of the release . . . ."[28] They also disclaimed any reliance on extra-contractual representations.[29]

The transaction closed on August 17.[30] Jhaveri received a pro rata share of the $40 million merger consideration based on his Bodhala stock ownership.[31]

---

incorporated by reference into the complaint[.]" (citation omitted)). As Equityholders' Representative, Goyle was authorized to act as "exclusive agent, attorney-in-fact, and representative" of Bodhala's stockholders. Merger Agreement § 10.8(a).

[26] *See* Mastria Aff. Ex. B ("Joinder Agreement") 1 (Recitals), 8 (Jhaveri's signature page). "[A]s a condition to their willingness to enter into the Merger Agreement, [Onit] and [its] Merger Sub . . . required that certain of the holders of [Bodhala] Capital Stock enter into th[e] Joinder Agreement . . . ." *Id.* at 1.

[27] Merger Agreement § 10.5(a); *see infra* Section II.B.1 (discussing the terms of the release in greater depth). "Equityholders" were defined as "the Stockholders and the Optionholders" of Bodhala. Merger Agreement art. I.

[28] Merger Agreement § 10.5(c).

[29] *Id.* § 10.5(c)(v).

[30] Compl. ¶ 26.

[31] *See* Merger Agreement art. I (defining "Initial Merger Consideration" as "an amount equal to (i) Forty Million Dollars ($40,000,000) . . . plus (ii) the Estimated Cash and Cash Equivalents as of the close of business on the Business Day immediately preceding the Closing Date, minus (iii) the Estimated Indebtedness as of immediately prior to Closing, minus (iv) the Estimated Transaction Expenses as of immediately prior to Closing, minus

### D. Jhaveri's Resignation

On September 8, 2021, Jhaveri met with defendant Eric Elfman—then Chief Executive Officer of Onit—to discuss Jhaveri's future at the combined company.[32] Jhaveri said that he felt excluded from meetings about the management performance plan and had yet to receive a formal employment agreement.[33] Elfman told Jhaveri that the lack of an employment agreement was an "oversight" but encouraged Jhaveri to apply to jobs at Onit outside of Bodhala.[34] Jhaveri interpreted this suggestion to mean that Elfman, others at K1, and Goyle were trying to force him to leave Bodhala, which he believed could prevent him from receiving payments under the management performance plan.[35] A few days later, Chick confirmed Jhaveri's fears, telling him that Elfman and Goyle "had discussed a plan to force Jhaveri out of Bodhala and into a consulting agreement."[36]

---

(v) the Estimated Downward Working Capital Adjustment, plus (vi) the Estimated Upward Working Capital Adjustment").

[32] Compl. ¶¶ 315-16.

[33] *Id.* ¶¶ 314-16.

[34] *Id.* ¶ 316.

[35] *Id.* ¶¶ 316-17. Jhaveri avers he would not be entitled to a payment under the Management Performance Plan if he were to take a position outside of Bodhala. *Id.* ¶ 317. I note, however, that the Merger Agreement names the individuals entitled to payments under the Management Performance Plan. *See* Merger Agreement sched. 1.1.

[36] Compl. ¶ 322.

The situation worsened for Jhaveri.[37]  In early October, he learned from Chick that Elfman had authorized Goyle to fire him.[38]  On October 14, 2021, Jhaveri voluntarily resigned.[39]

### E.    The Earnout

According to a formula laid out in the Merger Agreement, former Bodhala stockholders could receive up to $36 million in earnout payments if Bodhala hit certain annual recurring revenue ("ARR") targets after closing.[40]  No payments were owed unless Bodhala achieved at least $5.5 million in ARR as of March 11, 2022.[41]

Bodhala never achieved this ARR threshold.[42]  No earnout payments were paid.    Jhaveri blames Goyle, who—as Equityholders' Representative—was "charged as a fiduciary of the Equityholders tasked with guarding against frustration of the earnout."[43]  Jhaveri and other former Bodhala stockholders learned about the failed earnout through a letter Goyle and K1 sent on March 29, 2023.[44]

---

[37] *Id.* ¶ 324.

[38] *Id.* ¶ 325.

[39] *Id.* ¶ 326.

[40] *Id.* ¶ 45; Merger Agreement § 2.14 (providing the schedule for granting the payments based on ARR); *see also id.* at art. I (defining "Managing Performance Payments" and "Management Performance Payment Participants"); *id.* at sched. 1.1 (identifying the persons eligible for such payments).

[41] Merger Agreement § 2.14; *see* Compl. ¶ 45.

[42] Compl. ¶ 423.

[43] *Id.* ¶ 44.

[44] *Id.* ¶¶ 48, 56-57.

### F. This Litigation

In April 2024—nearly three years after the merger with Onit closed—Jhaveri filed a complaint in this court.[45] He brought ten claims against three groups of defendants: (1) Goyle;[46] (2) the "K1 Defendants";[47] and (3) the "Edison Defendants."[48]

Counts I, III, and IV are breach of fiduciary duty claims against Goyle and the Edison Defendants for "secretly tilting [Bodhala's] fundraising process to a sale to the K1 Entities" without Jhaveri's knowledge;[49] excluding Jhaveri from Board-level decisions;[50] and transferring financial control of Bodhala from Jhaveri to Goyle.[51] Count II is a related claim against the K1 Defendants for aiding and abetting Goyle

---

[45] *Id.*

[46] *Id.* ¶ 32.

[47] The "K1 Defendants" are K1 and its affiliates K4 Capital Advisors L.P. and K4 Private Investors, L.P.; Onit and its affiliate Onit Holdings, Inc. (together with K1, K4 Capital Advisors, and K4 Private Investors, the "K1 Entities"); Elfman; Eric Smith (Onit's Chief Operating Officer at the time of the merger); and Mike Velcich (an Onit director at the time of the merger). *Id.* ¶¶ 27-28, 38.

[48] The "Edison Defendants" are Edison Partners; Edison Partners IX; Edison IX GP, LLC (Edison Partners IX's general partner); Herscovici; and Christopher Sugden (managing partner and a managing member of Edison IX GP). *Id.* ¶¶ 33, 35-37.

[49] *Id.* ¶¶ 350-60.

[50] *Id.* ¶¶ 367-71.

[51] *Id.* ¶¶ 372-77.

and the Edison Defendants' purported breaches of fiduciary duty arising from their "secret[]" sale of Bodhala to Onit.[52]

Counts V and VII are claims for fraudulently inducing Jhaveri to (1) believe there was a legitimate fundraising process,[53] and (2) consent to the Merger Agreement.[54] Count VI is a related claim against the K1 Defendants for aiding and abetting this purported fraud.[55]

Count VIII is a claim for breach of the implied covenant of good faith and fair dealing against Goyle and the K1 Defendants.[56] Jhaveri alleges that although the Merger Agreement implied he would remain employed at Bodhala, he was pushed out by Goyle, the K1 Entities, and Elfman.[57]

Count IX is a claim against Goyle for breaching the Merger Agreement by "utilizing his [Equityholder Representative] powers to extract payments from the K1 Entities without corresponding payments to Equityholders" and not communicating with former Bodhala stockholders about the earnout.[58] Count X is a claim for

---

[52] *Id.* ¶¶ 361-66.

[53] *Id.* ¶¶ 378-84.

[54] *Id.* ¶¶ 391-400.

[55] *Id.* ¶¶ 385-90.

[56] *Id.* ¶¶ 402-08.

[57] *Id.* ¶¶ 404-05.

[58] *Id.* ¶¶ 410, 413-14; Merger Agreement § 10.8(b).

tortious interference against most of the K1 Defendants for assisting Goyle's purported breaches of his contractual duties.[59]

Jhaveri seeks relief including compensatory damages of "no less than $200,000,000," "punitive damages," and rescission of certain settlement agreements between Goyle and the K1 Entities.[60]

Each of the three defendant groups separately moved to dismiss.[61] Jhaveri filed an answering brief in opposition to each motion.[62] Each of the defendant groups then filed reply briefs in support of their motions.[63] Oral argument on the motions was presented on March 28,[64] after which I took the matter under advisement.

---

[59] Compl. ¶¶ 417-25. Count X was not alleged against Smith. *Id.*; *see supra* note 47 (defining the K1 Defendants).

[60] *Id.* at 97-98 (Prayer for Relief). Jhaveri cannot recover punitive damages in this court. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 886 (Del. Ch. 2022) ("Absent a statutory grant of authorization, the Delaware Court of Chancery does not have jurisdiction to assess punitive damages.").

[61] Opening Br. in Supp. of the K1 Defs.' Mot. to Dismiss (Dkt. 21) ("K1 Opening Br."); Opening Br. in Supp. of Def. Raj Goyle's Mot. to Dismiss (Dkt. 23); Edison Opening Br.

[62] Pl. Jhaveri's Answering Br. in Opp'n to Opening Br. in Supp. of Def. Raj Goyle's Mot. to Dismiss (Dkt. 34) ("Pl.'s Br. in Opp'n to Goyle"); Pl. Jhaveri's Answering Br. in Opp'n to Opening Br. and Joinder in Supp. of the Edison Defs.' Mot. to Dismiss (Dkt. 35); Pl. Jhaveri's Answering Br. in Opp'n to Opening Br. and Joinder in Supp. of the K1 Defs.' Mot. to Dismiss (Dkt. 36) ("Pl.'s Br. in Opp'n to K1").

[63] Reply Br. in Supp. of Def. Raj Goyle's Mot. to Dismiss (Dkt. 38); Reply Br. in Further Supp. of the K1 Defs.' Mot. to Dismiss (Dkt. 39) ("K1 Reply Br."); Defs. Edison P'rs Mgmt. LLC, Edison IX GP, LLC, Edison P'rs IX, LP, Christopher Sugden, and Daniel Herscovici's Reply Br. and Joinder in Supp. of Mot. to Dismiss (Dkt. 40).

[64] *See* Tr. of Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 53).

## II.    ANALYSIS

Goyle, the K1 Defendants, and the Edison Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Their motions are governed by the plaintiff-friendly reasonable conceivability standard.  I must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ."[65]  But I am "not required to accept every strained interpretation of [Jhaveri's] allegations."[66]  Nor must I accept conclusory assertions "unsupported by allegations of specific facts."[67]

The Edison Defendants also move to dismiss Christopher Sugden—the Managing Partner and a Managing Member of Edison IX GP—under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.[68]  "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery

---

[65] *Cent. Mortg. Co. v. Morgan Stanley Mortg Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[66] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[67] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000)

[68] Edison Opening Br. 6-10; *see* Compl. ¶ 36 (discussing Sugden's background).

11

of record."[69] But if there is no evidentiary record, a plaintiff "need only make a prima facie showing of personal jurisdiction," and "the record is construed in the light most favorable to the plaintiff."[70]

I begin with the threshold question of personal jurisdiction over Sugden. Because Jhaveri fails to meet his burden on this issue, Sugden is dismissed.

I then address the parties' arguments on the merits. The defendants assert that Jhaveri released Counts I through VII and that Counts VIII through X are non-viable. I agree as to Counts I through VIII, but deny the motion in part on Counts IX and X.

## A. Personal Jurisdiction Over Sugden

Sugden is a resident of Chattanooga, Tennessee.[71] He contends that this court lacks personal jurisdiction over him. Resolving this issue involves a two-step analysis. "[T]he court must first determine that service of process is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process norms of fair play and substantial justice."[72]

---

[69] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. 2007).

[70] *Id.*

[71] Dkt. 5 at 8. Delaware courts may rely on "extra-pleading material" beyond the allegations in the Complaint to determine whether a defendant is subject to personal jurisdiction. *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000).

[72] *Ryan*, 935 A.2d at 265.

Jhaveri fails on the first step. He alleges that the court has personal jurisdiction over Sugden under 6 *Del. C.* § 17-109 and 6 *Del. C.* § 18-109.[73] Neither statute provides an adequate basis to serve Sugden.

Section 17-109 of the Delaware Revised Uniform Limited Partnership Act permits service of process on a general partner of a Delaware limited partnership "in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited partnership or a violation by the general partner . . . of a duty to the limited partnership . . . ."[74] The only defendant organized as a Delaware limited partnership is Edison Partners IX.[75] But, according to the Complaint, Edison IX GP—not Sugden—is the general partner of Edison Partners IX.[76]

Section 18-109 of the Delaware Limited Liability Company Act permits service of process on a manager of a Delaware limited liability company "in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company . . . ."[77] Section 18-109 "narrowly refer[s] to [the]

---

[73] Compl. ¶ 40.

[74] 6 *Del. C.* § 17-109(a).

[75] Compl. ¶ 33.

[76] *Id.*; *see also supra* note 8 and accompanying text.

[77] 6 *Del. C.* § 17-109(a).

13

corporate governance and [] internal affairs of an LLC."[78] Sugden is the managing partner and a managing member of Edison IX GP.[79] This suit, however, concerns the internal workings of Bodhala—not Edison IX GP. None of Jhaveri's allegations concern Edison IX GP's business or governance.

Sugden is therefore dismissed for lack of personal jurisdiction.[80]

## B. The Released Claims

The defendants assert that seven of the ten counts in Jhaveri's Complaint are barred by comprehensive releases in Section 10.5 of the Merger Agreement.[81] Section 10.5 is "governed by and enforced and interpreted in accordance with the laws of the State of Delaware."[82] "Delaware courts recognize the validity of general releases."[83]

"A clear and unambiguous release 'will [only] be set aside where there is fraud, duress, coercion, or mutual mistake concerning the existence of a party's

---

[78] *Endowment Rsch. Grp., LLC v. Wildcat Venture P'rs, LLC*, 2021 WL 841049, at *5 (Del. Ch. Mar. 5, 2021).

[79] Compl. ¶ 36. Jhaveri also alleges that Sugden "has control" over Edison Partners, though he does not allege that Sugden is a manager of the entity, as required for personal jurisdiction under 6 *Del. C.* § 18-109. *Id.*

[80] Even if personal jurisdiction existed over Sugden, the claims against him would be dismissed on the merits. *See infra* Sections II.B and II.C.

[81] *See* Goyle Opening Br. 9-11.

[82] Merger Agreement § 10.5(b).

[83] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010).

14

injuries.'"[84] Jhaveri does not assert that the releases were procured through "fraud, duress, coercion, or mutual mistake."[85] Nor does he contend that the releases were unknown to him when he signed the Joinder Agreement, conditional, or void for want of consideration.[86]

Given that, I focus on the terms of the releases. "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[87] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as

---

[84] *Id.* (quoting *Parlin v. DynCorp Int'l*, 2009 WL 3636756, at *4 (Del. Super. Sept. 30, 2009)).

[85] *Id.*

[86] In *Cigna Health & Life Insurance v. Audax Health Solutions*, the Court of Chancery held unenforceable a release of claims in a letter of transmittal, the return of which was a condition to stockholders receiving merger consideration. 107 A.3d 1082, 1085 (Del. Ch. 2014). The court explained that stockholders became entitled to their merger consideration upon closing under 8 *Del. C.* § 251. *Id.* Because the merger consideration was a preexisting entitlement, it could not serve as new consideration for a release in the letter of transmittal. *Id.*

This case is different in several respects. The release was not effectuated by a separate agreement but included within the Merger Agreement itself. In *Cigna*, there was "no indication to stockholders that they may have to agree to a release." *Id.* at 1091. Here, by contrast, stockholders had notice of the release before final approval and closing. Equityholders explicitly "acknowledge[d] and agree[d]" in the Merger Agreement that their receipt of merger consideration constituted "express acceptance" of the release. Merger Agreement § 10.5(c). They further "acknowledge[d] and agree[d]" that the release was "a material inducement to the Released Parties to consummate the transactions contemplated by th[e] [Merger] Agreement . . . ." *Id.* Jhaveri confirmed his acceptance of the release when he executed the Joinder Agreement.

[87] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

15

reflected in the four corners of the agreement.'"[88] The court must construe the contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[89]

A court will not look beyond the four corners on an agreement if a contract is unambiguous.[90] Ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations."[91] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[92] Neither party here asserts that the releases are ambiguous.

Consistent with these principles of contract interpretation, "[i]f the language of the release is clear, it will be given effect."[93] And "[i]f the claim falls within the plain language of the release, then the claim should be dismissed."[94] Here, Counts I

---

[88] *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs*, 36 A.3d 776, 779 (Del. 2012)).

[89] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[90] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[91] *Eagle Indus.*, 702 A.2d at 1232.

[92] *Osborn*, 991 A.2d at 1160 (citation omitted).

[93] *Corp. Prop. Assocs. 6 v. Hallwood Grp. Inc.*, 817 A.2d 777, 779 (Del. 2003).

[94] *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011).

through VII fall squarely within the releases. Consequently, those claims are dismissed.

### 1. Terms of the Releases

Section 10.5 of the Merger Agreement includes a general release of claims by each "Equityholder."[95] Jhaveri is one such Equityholder. In Section 10.5(a), the Equityholders released Onit, Bodhala, and "and each of their respective past and present direct and indirect equityholders, parents, subsidiaries, . . . directors, . . . officers, employees, . . . agents and representatives, and each of their respective Affiliates."[96] These "Released Parties" include all defendants named in the Complaint.[97]

The claims released in Section 10.5(a) include:

> any and all commitments, rights, claims, counterclaims, demands, debts, liabilities, Losses, costs, expenses, attorneys' fees, obligations, promises, covenants, agreements, Contracts, charges, dues, sums of money, compensation, accounts, suits,

---

[95] Merger Agreement § 10.5.

[96] *Id.* § 10.5(a).

[97] *Id.* (defining "Released Parties" and "Released Party Affiliates"). Edison Partners IX was a "direct . . . equityholder" in Bodhala, which was one of the "Released Parties," thereby making it a "Released Party Affiliate." *Id.* Edison IX GP and Edison Partners are affiliates of Edison Partners IX, and Herscovici was a Bodhala director—making these individuals or entities also Released Party Affiliates. *Id.* (defining "Released Party Affiliates" to include, in relevant part, "parents, subsidiaries, . . . directors, . . . general partners, [and] limited partners"). Onit, Inc. and Onit Holdings, Inc. are expressly defined as Released Parties. *Id.*; *id.* at 1 (defining these terms). K1 controls Onit, and the other K1 Defendants are affiliates of K1. *See supra* notes 14, 47, and accompanying text. They are thus each "direct and indirect equityholders" of a Released Party and meet the definition of Released Party Affiliates. Merger Agreement § 10.5(a).

Actions, of any kind or nature whatsoever, whether known or unknown, suspected or unsuspected, matured or unmatured, contingent or otherwise, at Law or in equity, which such Equityholder or Related Party now has, has ever had or may hereafter have against any Released Party arising contemporaneously with or prior to the Closing or on account of or arising out of, directly or indirectly, any act, omission, matter, cause, circumstance, event or transaction occurring contemporaneously with or prior to the Closing, including any claims arising from or relating to the Equityholder's or any Related Party's prior relationship with the Released Parties or any Released Party Affiliate or the Equityholder . . . .[98]

The provision goes on to confirm that:

[e]ach Equityholder understands that this is a full and final general release of all claims, demands, causes of action, Losses, liabilities and obligations of any nature whatsoever, whether or not known, suspected or claimed, that could have been asserted in any Action against any of the Released Parties and the Released Party Affiliates.[99]

In Section 10.5(c), each Equityholder further agreed that the release in Section 10.5(a) was "a material inducement to the Released Parties to consummate the transactions contemplated by th[e] [Merger] Agreement and the Ancillary Agreements, and that the Released Parties w[ould] rely upon [] Section 10.5 in consummating such transactions."[100] The referenced "Ancillary Agreements" include the Joinder Agreement and Option Cancellation Agreement that Jhaveri

[98] Merger Agreement § 10.5(a).

[99] *Id*.

[100] *Id.* § 10.5(c).

executed at the same time as the Merger Agreement, which likewise contain releases.[101] Each Equityholder acknowledged "that its receipt of its [p]ro [r]ata [s]hare of the [i]nitial [m]erger [c]onsideration [would] constitute its express acceptance of the terms of the release set forth in [] Section 10.5."[102]

### 2. The Effect of the Releases

As noted above, Jhaveri does not dispute that he had full notice of the releases.[103] He received at least two drafts of the Merger Agreement before voting to approve it as a director and executing a Joinder Agreement as a stockholder.[104] By signing the Joinder Agreement, he affirmed that he "ha[d] consulted with counsel" about the Merger Agreement, was "fully apprised of the consequences of th[e] release," and "had access to adequate information regarding the terms of th[e] [Merger] Agreement, the scope and effect of the releases set forth [t]herein, and all

---

[101] In Section 4(a) of the Joinder Agreement, Jhaveri "irrevocably and unconditionally" released "the Buyer Group, [Bodhala], and each current and former manager, officer, director, equityholder, agent, representative, legal and financial advisor, of the Buyer Group, [Bodhala] and their respective Affiliates . . . from any and all actions, causes of action, suits, proceedings, executions . . . arising out of, or relating to, or accruing from [Jhaveri's] prior relationship with the Released Parties or [Jhaveri's] rights or status as a current or former, direct or indirect, equityholder, stockholder, . . . director, . . . officer, employee, or representative of the Released Parties." Joinder Agreement § 4(a). The Option Cancellation Agreement includes a nearly identical release in Section 1.4. Mastria Aff. Ex. C (Option Cancellation Agreement) § 1.4.

[102] Merger Agreement § 10.5(c).

[103] *See supra* notes 85-86 and accompanying text.

[104] *See supra* note 22 and accompanying text.

19

other matters encompassed by th[e] [Merger] Agreement to make an informed and knowledgeable decision . . . ."[105]  In exchange, he received and accepted a substantial sum of merger consideration.[106]

Counts I through VII are encompassed by the releases to which Jhaveri agreed.[107]

First, the fiduciary duty claims were released.  Count I is brought against Goyle and Herscovici for breaching their fiduciary duties as directors Bodhala of before closing; and against Edison Partners, Edison Partners IX, and Edison IX GP for similar breaches.[108]  Counts III and IV are similarly brought against Goyle and the Edison Defendants for additional pre-closing breaches of fiduciary duty.[109]  But Jhaveri released all claims against Bodhala, Edison Partners IX, and their directors, officers, employees, agents, and affiliates for any alleged misconduct before closing.[110]  Count II is brought against the K1 Defendants for allegedly aiding and

---

[105] Merger Agreement § 10.5(c).

[106] *See supra* note 31 and accompanying text.

[107] The release in the Merger Agreement preserves "rights or claims by the Equityholder arising from or under this Agreement or any Ancillary Agreement." Merger Agreement § 10.5(a).  Thus, Jhaveri's breach of contract, implied covenant, and tortious interference claims were not released.  Those claims are addressed on the merits below.  *See infra* Section II.C.

[108] Compl. ¶¶ 350-60.

[109] *Id.* ¶¶ 367-77.

[110] Merger Agreement § 10.5(a); *see supra* notes 97-98 and accompanying text (quoting release and explaining application to the Edison defendants).  Separately, Edison Partners IX (a non-controlling stockholder of Bodhala) and an employee of Edison IX GP (not a

abetting the Bodhala directors' pre-closing misconduct.[111] Jhaveri also released all claims these defendants.[112]

Second, the fraud claims were released.[113] Count V is brought against Goyle and the Edison Defendants for making purportedly fraudulent statements before closing.[114] Count VI is brought against various K1 Entities, Velcich, Elfman, and Smith for allegedly aiding and abetting pre-closing fraud by Goyle, Herscovici, and Sugden.[115] And Count VII is another fraudulent inducement claim brought against Goyle, the Edison Defendants, and the K1 Defendants for withholding terms of the Merger Agreement from Jhaveri.[116] Again, Jhaveri released all claims against these individuals and entities for any pre-closing misconduct.[117]

---

Bodhala stockholder) did not plausibly owe fiduciary duties. Jhaveri was also not owed duties as a Bodhala director.

[111] Compl. ¶¶ 361-66.

[112] Merger Agreement § 10.5(a); *see supra* notes 97-98 and accompanying text (quoting release and explaining application to the K1 Defendants). This claim also employs group pleading, failing to identify the specific acts each individual or entity took to "participate" in the alleged breach. *See In re Mindbody, Inc. S'holder Litig.*, 332 A.3d 349, 393 (Del. 2024) (explaining that the "knowing participation" element of an aiding and abetting claim requires "active participation rather than 'passive awareness'" (citation omitted)).

[113] *See infra* notes 131-133 (discussing whether the fraud claims were preserved under the releases).

[114] Compl. ¶¶ 372-77.

[115] *Id.* ¶¶ 385-90.

[116] *Id.* ¶¶ 391-401.

[117] *See supra* notes 97-98 and accompanying text. As discussed below, these claims also flout the anti-reliance provision in the Merger Agreement, in which Jhaveri disclaimed reliance on extra-contractual statements. *See infra* notes 124-126 and accompanying text.

### 3. Jhaveri's Arguments About the Releases and Disclaimers

Jhaveri advances several reasons why he believes his claims are not barred by the releases. None succeed.

First, Jhaveri asserts that Delaware law rejects the application of broad releases which "immunize systematic misconduct by fiduciaries."[118] Not so. Parties routinely release breach of fiduciary duty claims for past acts, and Delaware courts enforce such releases.[119]

Jhaveri also contends that "[b]road releases cannot shield fraudulent conduct"; he asserts, under Delaware law, "any disclaimer of fraud must be explicit and unambiguous."[120] He also cites case law standing for the unremarkable proposition that standard integration clauses are insufficient to bar claims of extra-contractual fraud.[121] But the Merger Agreement contained "language that . . . add[s] up to a

---

[118] Pl.'s Br. in Opp'n to Goyle 27.

[119] *See Feuer v. Dauman*, 2017 WL 4817427, at *4 (Del. Ch. Oct. 25, 2017) (dismissing a breach of fiduciary duty claim because "the claims asserted in the complaint were released as part of a settlement agreement"), *aff'd*, 187 A.3d 551 (Del. 2018) (TABLE) (explaining that "corporate fiduciaries can[] contract away or limit their fiduciary duties" in a release where the release "extinguishe[d] potential liability arising from prior acts" but not where it "purport[ed] to limit prospectively any exercise of fiduciary duty owed by [the] directors").

[120] Pl.'s Br. in Opp'n to Goyle 27 (citing *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

[121] *Id.* at 27-28 (citing *McDonald's Co. v. Easterbrook*, 2021 WL 351967 (Del. Ch. Feb. 2, 2021)); *McDonald's*, 2021 WL 351967, at *6 (explaining that disclaiming reliance on extra-contractual statements requires "explicit and comprehensive" language where parties "forthrightly affirm that they are not relying upon any representation or statement of fact

22

clear anti-reliance clause by which the [Equityholders] contractually promised that [they] did not rely upon statements outside the contract's four corners in deciding to sign the contract."[122]

Next, Jhaveri claims that the alleged fraud in the inducement of the Merger Agreement voids the release.[123] He relies on *ABRY Partners V L.P. v. F & W Acquisition LLC*, where the court held that contract terms could not preclude claims to rescind the contract based on intra-contractual fraud.[124] Yet Jhaveri is claiming fraud based on extra-contractual alleged misrepresentations.[125] In *ABRY Partners*, then-Vice Chancellor Strine rejected a similar argument, emphasizing that "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent

---

not contained [in the contract]" (citing *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *13 (Del. Ch. June 11, 2020); *Kronenberg*, 872 A.2d at 591).

[122] *ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006) (citation omitted); *see* Merger Agreement § 10.5(c); *supra* note 29 and accompanying text (quoting the anti-reliance provision in Section 10.5(c) of the Merger Agreement).

[123] Pl.'s Br. in Opp'n to Goyle 30.

[124] *Id.*; *see ABRY P'rs*, 891 A.2d at 1051.

[125] *See* Compl. ¶¶ 378-83 (alleging that Goyle and the Edison Defendants induced Jhaveri to consent to the Onit merger by fraudulently convincing him that it was part of a Series B fundraising process); *id.* ¶¶ 392-95 (alleging that Goyle, the Edison Defendants, and the K1 Defendants "fraudulently induced Jhaveri's consent to the Merger Agreement by entirely omitting and telling deliberate falsehoods about terms designed to restructure the consideration of the deal from the equal shares held by Jhaveri and Goyle").

inducement claim."[126]  The release in the Merger Agreement is thus not void due to fraud.

Finally, Jhaveri argues that the releases have "carveouts . . . that preserve [his] claims."[127]  He identifies two.  The release in the Merger Agreement excludes "any rights or claims by the Equityholder arising from or under th[e] [Merger] Agreement or any Ancillary Agreement."[128]  And the Joinder Agreement—one of the referenced Ancillary Agreements[129]—preserves five categories of claims, including fraud.[130]

Neither of these "carveouts" save Jhaveri.  First, neither agreement exempts fiduciary duty claims from the releases.  As to fraud, although the release in the Joinder Agreement excludes claims for "Fraud by a Released Party," the release in

---

[126] 891 A.2d at 1057.

[127] Pl.'s Br. in Opp'n to Goyle 28.

[128] *Id.* (quoting Merger Agreement § 10.5).

[129] *See supra* note 101 and accompanying text.

[130] Pl.'s Br. in Opp'n to Goyle 28 (quoting Joinder Agreement § 4).  The five preserved claims in the Joinder Agreement are:

> (i) any rights or claims by the Stockholder arising from or under this Agreement, the Merger Agreement or any Ancillary Agreement, (ii) any claim such Stockholder may have, in his or her capacity as a director or officer of [Bodhala] for indemnifications, whether pursuant to an indemnification agreement, under the Restated Charter as in effect immediately prior to the Closing or pursuant to applicable law or under the Tail Policy, (iii) any rights to any unpaid employment compensation due from [Bodhala] to the undersigned in the ordinary course of business, (iv) any right of contribution against another Stockholder, and (v) claims related to the Fraud of a Released Party.

Joinder Agreement § 4.

24

the Merger Agreement does not.[131]  The Joinder Agreement provides that if its terms conflict with the Merger Agreement, "the Merger Agreement shall control."[132]

Even if the release in the Joinder Agreement applied, Jhaveri's claims would fall outside it.  The fraud exclusion in the Joinder Agreement's release concerns intra-contractual fraud.[133]  Jhaveri's fraud claims refer exclusively to pre-closing conduct.

*          *          *

Jhaveri executed broad releases discharging all claims against Bodhala, Onit, and the other deal participants.  He agreed that he was only relying upon the representations in the Merger Agreement.  He is bound by those promises.  Since Counts I through VII fall within the scope of unambiguous releases, they are dismissed under Rule 12(b)(6).

### C.  The Remaining Claims

Three claims remain: breach of the implied covenant of good faith and fair dealing (Count VIII); breach of contract (Count IX); and tortious interference

---

[131] *Compare* Joinder Agreement § 4, *with* Merger Agreement § 10.5.

[132] Joinder Agreement § 5(d).

[133] The Merger Agreement defines "Fraud" as "common law fraud under Delaware law with respect to the making of one or more representations and warranties in Article III [of the Merger Agreement] or in any Ancillary Agreement."  Merger Agreement art. I; *see* Joinder Agreement 1 ("Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed to such terms in the Merger Agreement.").

25

(Count X). Goyle and the K1 Defendants named in those counts maintain that no claim is reasonably conceivable.[134] I consider each claim in turn.

### 1. Breach of the Implied Covenant

The implied covenant of good faith and fair dealing "attaches to every contract."[135] "The covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[136] A claim for breach of the implied covenant requires a plaintiff to plead "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damages to the plaintiff."[137]

Jhaveri asserts that the Merger Agreement contained an implied term that he "would remain with [Bodhala] long enough to participate in the earnout."[138] He asserts that the earnout structure created an expectation of his continued employment at Bodhala.[139] Goyle and the K1 Defendants (except Smith and Velcich) allegedly

---

[134] Count VIII is brought against Goyle, the K1 Entities, and Elfman. Count IX is brought against Goyle. And Count X is brought against the K1 Defendants other than Smith.

[135] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[136] *Id.* at 441 (citing *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[137] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998); *see also Metro Life. Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *15 (Del. Ch. Dec. 20, 2012).

[138] Pl.'s Br. in Opp'n to Goyle 53.

[139] Compl. ¶ 404 ("Jhaveri's continued employment at Bodhala was implied in the contract in being named a recipient of the Management Participant Plan."); *see also id.* ¶¶ 273-76.

breached that implied term by "push[ing] Jhaveri out of [] Bodhala."[140] This theory suffers from several defects.

To start, "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[141] Section 3.19 of the Merger Agreement states that "[e]ach employee, independent contractor and consultant of [Bodhala] is terminable at will."[142] It also confirms that "[t]here [we]re no agreements or understandings between [Bodhala] and any of its employees . . . that their employment or services [were] for any particular period."[143] The alleged implied term on which Jhaveri's claim rests contradicts these explicit terms.

Delaware courts are hesitant to recognize the implied covenant in the context of at-will employment "out of a concern that the [c]ovenant could thereby swallow the [employment at-will doctrine] and effectively end at-will employment."[144] In *E.I. DuPont de Nemours & Co. v. Pressman*, the Delaware Supreme Court recognized three narrow exceptions: (1) where an employer terminates an employee

---

[140] *Id.* ¶ 405; *see supra* note 57; *see also* Compl. ¶ 312 ("The K1 Entities facilitated Goyle pushing Jhaveri out after the closing of the transaction. By pushing him out, Jhaveri was robbed of his interests in the management performance plan."); *id.* ¶ 313 ("Here, there was no disclosure in the board meeting, term sheets, or Merger Agreement that Jhaveri could be pushed out by Goyle. Indeed, the Merger Agreement included Jhaveri as a beneficiary of the Management Performance Plan.").

[141] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[142] Merger Agreement § 3.19(c).

[143] *Id.*

[144] *Pressman*, 679 A.2d at 442.

in violation of public policy;[145] (2) where an employer misrepresents an important fact that the employee relies on "to accept a new position or remain in a present one";[146] or (3) where an employer "uses its 'superior bargaining power to deprive the employee of compensation that is clearly identifiable and is related to the employee's past services.'"[147]  None of these exceptions apply.

First, Jhaveri was not terminated.  He pleaded that he resigned from Bodhala "instead of allowing himself to be humiliated by being terminated by Goyle."[148]  The Complaint lacks facts describing the sort of "intolerable" working conditions that reasonably suggest constructive discharge.[149]  And Jhaveri cites no public policy that was violated by his departure.

The second exception is likewise inapplicable.  Jhaveri's implied covenant claim does not concern a statement by his employer that led him to stay with Bodhala

---

[145] *Id.* at 441 (citing *Monge v. Beebe Rubber Co.*, 316 A.2d 549 (N.H. 1974) (addressing the termination of an employee for refusing sexual advances)); *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 587-89 (Del. Ch. 1994) (addressing the termination of a lawyer for refusing to violate her ethical duties)).

[146] *Pressman*, 679 A.2d at 440-41 (citing *Merrill v. Crothall-American, Inc.*, 606 A.2d 96 (Del. 1992)).

[147] *Id.* at 441 (citing *Fortune v. National Cash Reg. Co.*, 364 N.E.2d 1251 (Mass. 1977)).

[148] Compl. ¶ 326 ("On or about October 14, 2021, Jhaveri would decide to leave Onit instead of allowing himself to be humiliated by being terminated by Goyle."); *see also supra* note 39 and accompanying text.

[149] *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 832 (Del. 2005) ("To establish a constructive discharge, the plaintiff [must] show 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" (citation omitted)).

28

or take a new position. Instead, his claim turns on his expectations for future tenure at Bodhala.

Finally, though Jhaveri claims that Goyle and the K1 Defendants excluded him from the negotiation process—and might have had "superior bargaining power"[150]—the compensation at issue was a contingent earnout payment. The payment was forward-looking; it did not "relate[] to [Jhaveri's] past services."[151] No members of Bodhala received the management performance payments.[152]

Jhaveri's implied covenant claim is dismissed.

### 2. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) resulting damage to the plaintiff."[153] Jhaveri claims that Goyle, as Equityholders' Representative, breached certain obligations in the Merger Agreement related to the ARR earnout target. These breaches allegedly harmed Jhaveri by depriving him of his share of the earnout payment.

---

[150] *Pressman*, 679 A.2d at 441; *see supra* note 147 and accompanying text.

[151] *Pressman*, 679 A.2d at 441.

[152] *See supra* note 42 and accompanying text.

[153] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

Jhaveri alleges that Goyle willfully breached the Merger Agreement in connection with the ARR payments in four ways:[154]

> (1) by not providing information about [payments from the K1 Defendants] despite numerous requests from Equityholders;

> (2) not communicating with the Equityholders about the ARR Payments, Holdback payments, and Reserve Amount, [while] also coordinat[ing] with the K1 Entities to keep the Equityholders in the dark including by sending notes to the K1 Entities directing them not to communicate with the Equityholders;

> (3) not challenging the ARR [r]ealization [p]ayments despite numerous threats to sue based on claims of interference in the [e]arnout by Onit COO Eric Smith; and

> (4) not challenging the ARR [r]ealization payments despite interference in sales of [its product, Smart Invoice Review].[155]

Jhaveri's claim fails as to the first and second alleged breaches. The Merger Agreement does not create any obligation for the Equityholders' Representative to communicate with Equityholders or inform them about the earnout or any other payment from K1.

---

[154] The Merger Agreement exempts the Equityholders' Representative from liability "for any actions taken or omitted to be taken under or in connection with t[he] [Merger] Agreement . . . or the transactions contemplated [t]here[in] . . . except for such actions taken or omitted to be taken resulting from the Equityholders' Representative's *willful misconduct*." Merger Agreement § 10.8(b) (emphasis added).

[155] Compl. ¶ 414; *see also id.* ¶¶ 48-50, 52-53, 65-66, 157-59.

The third and fourth alleged breaches, however, give rise to a reasonably conceivable breach of contract claim. Section 2.14(b) of the Merger Agreement sets a process by which Onit must report the ARR to the Equityholders' Representative, including a procedure the Equityholders' Representative could follow to raise "questions or concerns" about Onit's "calculations."[156] More pertinently, Section 2.14(d) states that the Equityholders' Representative "*shall* deliver written notice" to Onit of any "action or omission of [Onit] the effect of which [wa]s to frustrate" achievement of the ARR threshold.[157]

Jhaveri alleges that Goyle failed to deliver a notice of dispute after receiving Onit's statement that ARR was below the $5.5 million threshold required for an

---

[156] The Merger Agreement contemplated the following procedure:

> Within five (5) Business Days following request therefor [sic] by the Equityholders' Representative (which request shall not be made more than once per calendar quarter), the Buyer shall deliver to the Equityholders' Representative a statement setting forth in reasonable detail the ARR of the Company as of the date of such request. Upon request by the Equityholders' Representative following the Equityholders' Representative's review of such statements, the Buyer shall participate in a teleconference to discuss the calculations set forth in such statements (including any questions or concerns that the Equityholders' Representative has with the information set forth therein). No later than April 5, 2022, the Buyer shall deliver to the Equityholders' Representative a statement setting forth in reasonable detail the ARR of the Company as of the Measurement Date and the Buyer's determination of the resulting ARR Realization Payment Amount.

Merger Agreement § 2.14(b).

[157] *Id.* § 2.14(d) (emphasis added); *see* Compl. ¶¶ 44, 46.

earnout payment.[158]  According to the Complaint, Goyle knew Onit had "interfered with company performance and achievement of the" earnout.[159]  Goyle allegedly planned to sue for the payments from Onit but opted not to challenge the ARR statement after he was offered a lucrative "soft landing" by the K1 Defendants.[160]  Jhaveri argues that Goyle's willful inaction breached Section 2.14(d) of the Merger Agreement.[161]

In Goyle's view, Jhaveri's allegations are deficient because the Merger Agreement did not "permit [Goyle] to challenge the [ARR] payment based on bad business strategy or execution."[162]  This argument ignores Jhaveri's allegation that Goyle knew of active "interference" by the K1 Defendants but purportedly made the self-interested decision to hold back written notice of their improper actions, despite his obligation in Section 2.14(d).[163]  Taking these allegations as true, Jhaveri has identified a viable potential breach of Section 2.14(d).

The motion is denied insofar as Count IX its concerns Goyle's failure to challenge the ARR statement and related interference with the earnout.  It is granted

---

[158] Compl. ¶ 48.

[159] *Id.* ¶ 52.

[160] *Id.* ¶¶ 52-55, 61 (providing factual allegations in support of this theory).

[161] Pl.'s Br. in Opp'n to Goyle 59.

[162] Goyle Opening Br. 27.

[163] *See supra* notes 158-160 and accompanying text.

insofar as Count IX concerns Goyle's failure to communicate with other Bodhala stockholders.

### 3. Tortious Interference

Jhaveri's final claim is for tortious interference with contract. To prevail, he must show "(1) a contract, (2) about which [the] defendant[s] knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[164] He contends that the K1 Entities, Elfman, and Velcich tortiously interfered with Goyle's obligations as Equityholders' Representative as provided in the Merger Agreement.[165]

To start, this claim cannot proceed against Onit, which is a party to Merger Agreement.[166] "[A] party to a contract cannot tortiously interfere with that same contract . . . ."[167]

---

[164] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[165] Compl. ¶¶ 417-25; Pl.'s Br. in Opp'n to K1 37-38.

[166] Merger Agreement 1; *see supra* note 47 (defining the K1 Entities to include Onit).

[167] *Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009); *see also Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009) ("It is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract."); Restatement (Second) of Torts § 766 (1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person . . . is subject to liability.").

33

The other K1 Entities, Elfman, and Velcich are all Onit affiliates.[168] They thus potentially fall under the "affiliate exception," which requires that a defendant to a tortious interference claim "be a stranger to both the contract and the business relationship giving rise to and underpinning the contract."[169] This exception grants a limited "privilege among affiliates to discuss and recommend action" given their "shared economic interests."[170] But the privilege is "qualified" in that it "arises when [an affiliated party] pursues lawful action in the good faith pursuit of its profit making activities."[171] If the affiliate's alleged "interference was motivated by some malicious or other bad faith purpose," the privilege may be overcome.[172]

Even if the remaining K1 Defendants were sufficiently affiliated with Onit, Jhaveri's allegations make it reasonably conceivable that the limited privilege is inoperative here.[173] He alleges that the K1 Defendants undertook "extraordinary

---

[168] *See supra* notes 14, 47, and accompanying text (describing the relationships between the various K1 Entities and individuals).

[169] *AM Gen. Hldgs. LLC v. Renco Group, Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 31, 2013) (citing *Tenneco Auto. Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007)).

[170] *Shearin*, 652 A.2d at 591; *AM Gen.*, 2013 WL 5863010, at *12.

[171] *Shearin*, 652 A.2d at 590.

[172] *Id.* at 591; *see also AM Gen.*, 2013 WL 5863010, at *12 (explaining that to overcome the affiliate exception, a plaintiff's allegations must meet a "stringent bad faith standard" (citing *Allied Cap. Corp. v. GC-Sun Hldgs., LP,* 910 A.2d 1020, 1039 (Del. Ch. Nov. 22, 2006))).

[173] Neither party briefed nor argued the application of the affiliate exception. I need not resolve whether the K1 Entities (other than Onit) fall within its scope because Jhaveri sufficiently pleads bad faith.

steps to hide payments to Goyle"—including making "material misstatements" to Jhaveri and other Bodhala stockholders and taking other "bad faith acts"—to persuade Goyle not to challenge the earnout.[174] Based on these facts, Jhaveri adequately pleads a "malicious or other bad faith purpose" allowing his tortious interference claim to proceed against Onit's affiliates—provided that the elements of the claim are met.[175]

Jhaveri meets his pleading burden on the first, second, third, and fifth elements. The other K1 Entities and individuals named in this count are Onit affiliates who conceivably knew the Merger Agreement's terms.[176] The K1 Defendants purportedly offered Goyle a "sham contract" that was concealed from Bodhala stockholders, which allowed them to "structure[] payments" to Goyle as a quid pro quo for withholding a challenge the ARR statement or failed earnout.[177] Jhaveri asserts that this agreement with Goyle was "a significant factor in leading

---

[174] Compl. ¶¶ 41-42, 46, 48-54; Pl.'s Br. in Opp'n to K1 39 (arguing that the K1 Defendants took steps to "undermine[] the very purpose of having an Equityholders' Representative" by incentivizing Goyle to breach his contractual duties to other stockholders).

[175] *See supra* note 172 and accompanying text.

[176] *See* Compl. ¶ 419.

[177] *Id.* ¶ 423; *id.* ¶ 420 ("Elfman lied to shareholders that Goyle was no longer under contract with Onit and was not reachable . . . ."); *id.* ¶¶ 421-22 (alleging that Velcich and Elfman together drafted, and Velcich sent, "a letter . . . with the material misstatement that there had been no communications with Goyle as [Equityholders' Representative], despite his knowledge of the litigation threats made [by] Goyle as [Equityholders' Representative] and the K1 Entities' negotiations with Goyle to structure payments to Goyle").

35

Goyle to breach his [Equityholders' Representative] duties."[178] Jhaveri also pleads that, as a result of these actions, he was deprived of payments he would otherwise have received.[179]

The fourth element—whether the interference was "without justification"—is more complex.[180] It "requires the court to engage in a fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case"—a task ill-suited for the pleading stage.[181] Jhaveri's allegations of "fraudulent, intentional, willful, and malicious" actions by the K1 Defendants are sufficient.[182]

---

[178] *Id.* ¶ 423.

[179] *Id.* ¶ 435. The K1 Defendants argue that Jhaveri cannot satisfy the damages element of his claim because the ARR threshold was unmet. K1 Opening Br. 16; *see also* K1 Reply Br. 12-13. But Jhaveri's theory is that the K1 Defendants convinced Goyle not to challenge their purported interference with Bodhala's business that led to it missing the threshold. If Goyle successfully challenged the ARR statement, it is reasonably conceivable that a payment might be owed to Jhaveri.

[180] *See Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019) (describing the "existence of justification" element as "non-straightforward").

[181] *Id.* at *26 (explaining that this element involves the weighing of factors such as "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." (citing Restatement (Second) of Torts § 767)).

[182] Compl. ¶ 424; *see also supra* notes 174, 177, and accompanying text.

The motion to dismiss is therefore denied on Count X against K1, K4 Capital Advisors, K4 Private Investors, Onit Holdings, Elfman, and Velcich. The motion is granted on Count X as to Onit.

## III. CONCLUSION

The defendants' motions to dismiss are granted in part and denied in part. The court lacks jurisdiction over Sugden, who is dismissed from this action. Counts I through VII of the Complaint were released and are dismissed with prejudice on that basis. Count VIII fails to state a claim upon which relief can be granted and is dismissed with prejudice. Count IX states a viable claim in part and fails in part, as outlined above. Count X survives, except as to Onit. Additionally, punitive damages are unavailable.